UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHERYL WILLIAMS, a California citizen,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL UNION FIRE INSURANCE CO OF PITTSBURGH, PA, a Pennsylvania corporation,<br><br>Defendant. | Civil No. 12cv01590 AJB (MDD)<br><br>ORDER DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT<br><br>[Doc. Nos. 21, 22 ] |

Presently before the Court are the cross-motions for summary judgment filed by Plaintiff Cheryl Williams ("Plaintiff") (Doc. No. 21) and Defendant National Union Fire Insurance Co. of Pittsburgh, PA ("Defendant"), (Doc. No. 22).[1] The hearing set for April 18, 2013 is hereby vacated as the Court finds these motions appropriate for submission on the papers without oral argument pursuant to Civil Local Rule 7.1.d.1. For the reasons

[1] Plaintiff Cheryl Williams, decedent's wife, initially filed this action. Sadly, however, Mrs. Williams passed away recently, and the Court subsequently granted the parties' joint motion to substitute Bethany Williams and Stephen Williams, co-trustees of the Jack and Cheryl Williams Revocable Living Trust, as named Plaintiffs in the above-entitled action. For clarity's sake, the Court refers generally to Plaintiff Cheryl Williams throughout this opinion as she was the operative Plaintiff during the majority of this litigation and the briefing of the instant cross-motions for summary judgment. Despite referring solely to Plaintiff Cheryl Williams, this opinion is nevertheless applicable to all of the named Plaintiffs in this action, specifically including Bethany and Stephen Williams.

set forth below, Plaintiff's cross-motion for summary judgment is DENIED, and Defendant's cross-motion for summary judgment is GRANTED.

## BACKGROUND

### Factual History

This case arises out of the denial of a claim for accidental death benefits under a Blanket Accident Insurance Policy ("Policy") issued to Paul Ecke Ranch, Inc. ("Paul Ecke Ranch") by Defendant. Defendant issued an insurance policy, number GTP 9116405, which provided accidental death benefits to Paul Ecke Ranch employees from February 15, 2010, to February 15, 2011. (Administrative Record ("A.R.") 00037.)[2] Plaintiff's husband, Jack Williams ("Mr. Williams"), was employed by Paul Ecke Ranch, and insured by the Policy issued by Defendant. (A.R. 00039.) Under the Policy, Mr. Williams was eligible to receive an "Accidental Death Benefit" of one million dollars; Plaintiff was designated as the beneficiary under the Policy. (A.R. 00038, 00050.) The Policy's general insuring clause provides, "If injury to the Insured Person results in death within 365 days of the date of the accident that caused the Injury, the Company will pay 100% of the Principle Sum."[3] (A.R. 00009.)

At the time of Mr. Williams' death, he was the international products manufacturer and technical support representative for Paul Ecke Ranch in Encinitas, California. (A.R. 00614.) Mr. Williams traveled extensively for his job, including international trips to Japan and Australia. (A.R. 00200.) Immediately prior to his death, Mr. Williams spent approximately twenty-eight hours in flight over a five-day period. (A.R. 00200.) During this time, Mr. Williams traveled from the United States to Japan and then to Australia. (A.R. 00200.) On August 18, 2010, Mr. Williams was preparing to travel to Melbourne, Australia, when he collapsed outside of his hotel in Terrigal, Australia. (A.R. 00200.)

---

[2] Relevant citations are to the Administrative Record filed jointly by the parties on November 16, 2012. (Doc. No. 14.)

[3] "Principle Sum" is defined under the Policy as "the amount of insurance in force under this Policy on that person for that Hazard and Benefit as described for the Insured Person's eligible class in the Principle Sums, Hazards and Benefit section of the Declarations section of this Policy." (A.R. 00152.)

Mr. Williams was taken to a local hospital where he was pronounced dead upon arrival. (A.R. 00200.) An autopsy was performed by the Newcastle Department of Forensic Medicine, the details of which are included in an Autopsy Report ("Report"), dated June 9, 2011. (A.R. 00200.) The Coroner determined Mr. Williams died of a massive Pulmonary Thromboembolism ("PE"), with an "antecedent" cause of Deep Vein Thrombosis ("DVT"). (A.R. 00200.) Additionally, the Coroner noted that "migration of emboli from the leg veins had occurred over a period of a few days," and there was a possibility "that the onset of formation of [the] thromboemboli may have occurred around the same time of [Mr. Williams'] air travel." (A.R. 00201.) Mr. Williams' autopsy did not reveal any sign of external trauma, (A.R. 00199 - 00209), and neither party references any unusual occurrences on the flights preceding Mr. Williams' death.

**Terms Of The Policy**

Under the Policy, Defendant agreed to "insure eligible persons . . . against loss covered by this Policy subject to its provisions, limitations, and exclusions." (A.R. 00144.) Relevant portions of the Policy provide coverage related to travel on a Civilian Aircraft, specifically extending coverage for "[i]njury sustained while riding as a Passenger in or on (including getting in or out of, or on or off of): any Civilian Aircraft . . ..." (A.R. 00159.) "Injury" is specifically defined by an endorsement to the policy as follows:

> Injury- means bodily injury: (1) which is sustained as a direct result of an unintended, unanticipated accident that is external to the body and that occurs while the injured person's coverage under this Policy is in force; (2) which occurs under the circumstances described in a Hazard applicable to that person; and (3) which directly (independent of sickness, disease, mental capacity, bodily infirmity or any other cause) causes a covered loss under a Benefit applicable to such Hazard.

(A.R. 00173.) The Policy also sets forth several exclusions to coverage, including bodily injury that results from "sickness, disease, mental incapacity or bodily infirmity" or "stroke or cerebrovascular accident or event; cardiovascular accident or event; myocardial infarction or heart attack; coronary thrombosis; aneurysm." (A.R. 00173 - 00174.) The applicable terms of the Policy, including the above-mentioned endorsement and

exclusions, will be discussed further below.

**Plaintiff's Claim For Benefits Under The Policy**

On October 29, 2010, Plaintiff submitted a "Proof of Loss - Accidental Death" claim form to Defendant. (A.R. 00050 - 00051.) On November 4, 2010, Defendant, through its claims administrator Chartis Claims, Inc. ("Chartis"), sent a letter to Plaintiff acknowledging receipt of her claim for accidental death benefits. (A.R. 00052) The letter explained Defendant was reviewing Plaintiff's claim, and confirmed the Policy "provide[d] benefits when an eligible person sustains a bodily injury caused by an accident resulting directly and independently of all other causes." (A.R. 00052.) Defendant sent Plaintiff an additional letter on February 3, 2011, indicating that it was investigating the claim and in the process of obtaining information concerning Mr. Williams' death, including Mr. Williams' death certificate, business travel itinerary, and any police or hotel security reports. (A.R. 00070.) On February 28, 2011, Defendant sent Plaintiff a letter detailing the process of the investigation and status of the requested documents. (A.R. 00084.)

Plaintiff responded to Defendant via email on March 7, 2011, providing Defendant with Mr. Williams' travel itinerary for the day he died. (A.R. 00088 - 00090.) Plaintiff also provided Defendant with information regarding a previous Workers' Compensation claim for Mr. Williams' which had been approved. (A.R. 00088 - 00090.) Plaintiff explained that Mr. Williams was given a "clean bill of health" approximately three months before his death, and that the medical report indicating as such was included in the Workers' Compensation approval. (A.R. 00090.) On March 18, 2011, Defendant received a confidential Investigative Report from International Claims Specialist, a third-party investigative service. (A.R. 00119 - 00136.) The Investigative Report included a letter from the Gosford Coroners Court, a copy of Mr. Williams' death certificate, and a letter from Hortica Insurance & Employee Benefits regarding Mr. Williams' Workers' Compensation benefits and claim. (A.R. 00118 - 00136.) The letter from the Gosford Coroners Court indicated Mr. Williams' cause of death was PE and DVT. (A.R. 00127.)

On July 18, 2011, Defendant sent a letter to Plaintiff informing her that the claim file had been sent to management for a final claim determination. (A.R. 00236.) In August 2011, Plaintiff forwarded Defendant a copy of the Stipulation with Request for Award in the Workers' Compensation Appeal Board matter involving Mr. Williams' death. (A.R. 00252 - 00254.) The Stipulation awarded benefits to Mr. Williams' daughter and partial dependent, Bethany Williams. (A.R. 00252 - 00254.)

On September 1, 2011, Defendant denied Plaintiff's claim for benefits under the Policy. (A.R. 00624 - 00625.) Specifically, the denial letter provided as follows: "[I]t is our position the record does not demonstrate that Mr. Williams' death resulted from a bodily injury sustained as a direct result of an unintended, unanticipated accident that was external to the body, but that his death occurred due to a sickness, which likely developed over a period of days and was not caused by an unintended, unforeseen, or unexpected event." (A.R. 00642 - 00645.) Additionally, the denial letter concluded the "policy specifically excludes coverage for losses that result, in whole or in part from sickness, disease, mental incapacity or bodily infirmity where the loss results directly or indirectly from any of these." (A.R. 00257.) The letter also informed Plaintiff of her right to appeal Defendant's decision, and encouraged Plaintiff to submit any additional documentation to support her claim for benefits under the Policy. (A.R. 00414 - 00416.) Plaintiff subsequently submitted additional information regarding Mr. Williams' flight history immediately preceding his death. (A.R. 00323.) Additionally, Plaintiff filed a timely appeal of Defendant's determination on December 1, 2011. (A.R. 00277.)

In February 2012, Defendant obtained outside legal counsel to review the appeal filed by Plaintiff along with the original denial of Plaintiff's claim.[4] (A.R. 00339, 00350.) Defendant's outside counsel determined that Mr. Williams' death did not result from an "accident" within the terms of the Policy. (A.R. 00350.) This conclusion was detailed in a letter from outside counsel to Chartis dated February 26, 2012, which

[4] Specifically, Defendant sought legal review of its coverage determination from Michael W. Connally, Esq. of Lewis Brisbois Bisgaard & Smith, LLP. (A.R. 00350.)

included an analysis of the Policy, the claims file, and applicable case law. (A.R. 00350 - 00369.) On March 6, 2012, Defendant informed Plaintiff the file was scheduled for review by the Employee Retirement Income Security Act ("ERISA") Appeal Committee. (A.R. 00869 - 00871.) The Administrative Record, including the opinion letter from Defendant's outside counsel, was submitted to the ERISA Appeal Committee for review on April 18, 2012. (A.R. 00869 - 00871.) On April 25, 2012, Plaintiff was advised the ERISA Appeal Committee denied Plaintiff's claim based upon its determination that Mr. Williams' death was not the result of bodily injury sustained as a direct result of an unintended, unanticipated accident that was external to the body. (AR 00870, 00872 - 00873.)

**Procedural History**

Plaintiff thereafter filed a Complaint against Defendant in this Court alleging a violation of Section 502(a)(1)(B) of ERISA, 29 U.S.C. Ch. 18, which provides certain rights and remedies for individuals who participate in employee benefits plans. (Doc. No. 1.) Specifically, Section 502(a)(1)(B) permits a beneficiary of an employee benefit plan to bring a civil action to recover benefits owed under the terms of the plan. The parties jointly filed the Administrative Record on November 16, 2012. (Doc. No. 14-1.) Pursuant to the briefing schedule set by the Court, each party filed their respective motions for summary judgment on December 18, 2012. (Doc. Nos. 21, 22.) The parties filed their oppositions on January 24, 2013, (Doc. Nos. 26, 27), and subsequently filed replies in support of the cross-motions for summary judgment on February 14, 2013, (Doc. Nos. 28, 29).

**LEGAL STANDARD**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). The movant must support their position that a material fact is or is not genuinely disputed by either "citing

to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. *Id.* at 323. The burden initially falls on the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp*., 477 U.S. at 323). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (footnote omitted).

The nonmoving party may not rely on the mere allegations in the pleadings and instead must set forth specific facts showing that there is a genuine issue for trial. *T.W. Elec. Serv*., 809 F.2d at 630. At least some "'significant probative evidence tending to support the complaint'" must be produced. *Id.* (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)); *see also Addisu*, 198 F.3d at 1134 ("A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact.") "[I]f the factual context makes the non-moving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Cal. Arch'l Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587); *Addisu*, 198 F.3d at 1134

("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.")

In adjudicating summary judgment motions, the court must view all evidence and inferences in the light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 631. Inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. *Id*.

**STANDARD OF REVIEW**

Courts generally apply a *de novo* standard of review when assessing a denial of benefits in a case that is subject to ERISA, unless the policy specifically requires the application of an abuse of discretion standard. *Metropolitan Life Insurance Co. V. Glenn*, 544 U. S. 105, 110-11 (2008); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The more lenient abuse of discretion standard may be applied only if the plan at issue "unambiguously indicate[s] that the plan administrator 'has authority, power, or discretion to determine eligibility or to construe the terms of the Plan . . .. ' " *Feibusch v. Integrated Device Tech., Inc. Employee Ben. Plan,* 463 F.3d 880, 884 (9th Cir. 2006) (citing *Sandy v. Reliance Standard Life Ins. Co.*, 222 F.3d 1202, 1207 (9th Cir. 2000)). In a *de novo* review, the court is required to evaluate independently whether the plan administrator correctly denied benefits. *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 963 (9th Cir. 2006). Extrinsic evidence may be considered by the court on *de novo* review, but only under certain limited circumstances. *Mongeluzo v. Baxter Travenol Long Term Disability Plan*, 46 F.3d 938, 943-44 (9th Cir. 1995). Discretion to consider evidence outside of the administrative record should only be exercised " 'when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision.' " *Id.* at 944 (quoting *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.3d 1017, 1025 (4th Cir. 1993) (*en banc*)). However, when an administrative record is sufficiently developed, the district court may simply conduct a *de novo* review of the record and the administrator's decision. *James v. Equicor, Inc*., 791 F. Supp. 804, 808 (N.D. Cal. 1992) (citing *Luby v. Teamsters Health, Welfare & Pension*

*Tr. Funds*, 944 F. 2d 1176, 1185 (3rd Cir. 1991)).

The parties do not dispute that a *de novo* review is appropriate in this matter. (Doc. No. 22-1 at 14.; Doc. No. 21-1 at 16.) Nor do the parties contend evidence outside the Administrative Record should be considered by the Court in determining whether Defendant's denial of benefits was reasonable. Therefore, the Court limits its review to the Administrative Record. *See Brown v. Setiz Foods, Inc. Disability Benefits Plan*, 140 F. 3d 1198, 1200 (8th Cir. 1998) (finding this type of review to be in accord with the policy of ensuring expeditious resolution of ERISA benefit decisions and preventing district courts from becoming plan administrators).

***DISCUSSION***

**A. Interpretation of ERISA Insurance Policies Generally**

Federal common law is applied to questions of insurance policy interpretation under ERISA. *Firestone*, 489 U.S. at 110; *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 98 (1983) (holding that federal common law of ERISA preempts state law in the interpretation of ERISA benefit plans). As such, terms of ERISA insurance policies are interpreted in their "ordinary and popular sense as would a person of average intelligence and experience." *Babikian v. Paul Revere Life Ins. Co.*, 63 F.3d 837, 840 (9th Cir. 1995) (internal quotations and citation omitted). Further, courts will "not artificially create ambiguity where none exists." *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir. 1990) (quoting *Allstate Insurance Co. v. Ellison*, 757 F.2d 1042, 1044 (9th Cir. 1985). "If a reasonable interpretation favors the insurer and any other interpretation would be strained, no compulsion exists to torture or twist the language of the policy." *Id.* However, as federal common law governing ERISA suits is developed, courts may "borrow from state law where appropriate, and [be] guided by the policies expressed in ERISA and other federal labor laws." *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1124-25 (9th Cir. 2002) (internal citations omitted).

**B. The Parties' Arguments**

Plaintiff's cross-motion for summary judgment is predicated on Plaintiff's

contention that Mr. Williams' death qualified as an "injury" within the meaning of the Policy, thereby triggering coverage and the resulting benefits for Plaintiff. (Doc. No. 21-1 at 11.) As an initial matter, Plaintiff discusses the distinction between "accidental death" and "accidental means" policies, arguing that the Policy at issue should be classified as an "accidental death" policy, and therefore construed broadly. (Doc. No. 21-1 at 12.) Plaintiff then alleges that Mr. Williams died "'as a direct result of an unintended, unanticipated accident that is external to the body,' because he died from a blood clot caused by confined seating."[5] (*Id.*) Additionally, Plaintiff contends that Mr. Williams' death does not fall within two specific exclusions from coverage under the Policy, namely that Mr. Williams' death did not occur from "sickness, disease, mental incapacity, bodily infirmity" and further, that his death was not directly caused by a "cardiovascular accident or event." (*Id.*) Accordingly, Plaintiff asserts she is entitled to summary judgment in her favor as there are no genuine issues of material fact as to whether Mr. Williams' death was an injury covered by the Policy.

Defendant's cross-motion for summary judgment raises similar issues, but in the alternative, Defendant contends Mr. Williams did not die from an "accident" under the terms of the Policy. (Doc. No. 22-1 at 11.) Rather, Defendant argues the denial of benefits under the Policy was based on a finding that Mr. Williams' death was "the direct result of sickness, disease, or bodily injury, which is precisely what the Policy excluded." (*Id.*) Thus, Defendant contends, "[b]ased on a common sense interpretation of the Policy language, it is an undeniable conclusion that Plaintiff's [Mr. Williams'] death by DVT was not the direct result of an accident external to the body, but was, in fact, the result of sickness, disease, or bodily infirmity." (*Id.* at 12.) In making this argument, Defendant relies upon case law from outside the ERISA context concluding that DVT is not external to the body. (*Id.*) As such, Defendant asserts it is entitled to summary judgment on the basis that Mr. Williams' death is not covered under the terms of the Policy.

///

---

[5] The internal quotation marks denote reference to the terms of the Policy.

**C. “Accidental Death” Versus “Accidental Means”**

Plaintiff initially argues the Policy at issue should be classified as an “accidental death” policy, and thus construed broadly with respect to the proof required to trigger coverage. (Doc. No. 21-1 at 12)*; see Weil v. Federal Kemper Life Assur. Co.*, 7 Cal. 4th 125, 140 (1994) (noting “policies requiring only that there be proof of accidental death are construed broadly, such that the injury or death is likely to be covered unless the insured virtually intended his injury or death”). As a result, Plaintiff contends the burden of establishing coverage is relatively low, and the terms of the Policy must be liberally construed in favor of coverage. (*Id.*) In contrast, Defendant contends whether the Policy is an “accidental death” or “accidental means” policy is of little consequence as “the Policy only covers loss from an accident, defined in pertinent part to mean an event ‘external to the body.’ ” (Doc. No. 26 at 15.)

The distinction between “accidental death” and “accidental means” with respect to insurance coverage has been upheld in California courts. *Weil v. Fed. Kemper Life Assurance Co.*, 7 Cal. 4th 125, 134–40; *Paulissen v. U.S. Life Ins. Co. in City of New York*, 205 F. Supp. 2d 1120, 1128 (C.D. Cal. 2002). Plaintiff relies on this distinction for the proposition that an “accidental death” policy “requires only that the insured’s death was not designed or anticipated by the insured,”[6] an argument also set forth in the *Bornstein* case. *Bornstein v. J.C. Penny Life Ins. Co.*, 946 F. Supp. 814, 819 (C.D. Cal. 1996). Specifically, in *Bornstein*, the insurer denied payment under the policy when an insured died as a result of a stroke. The court denied the insurer’s motion for summary judgment and set forth a definition of accident on which it largely based its decision. The court in *Bornstein* defined an “accidental” death as one where “the death of the insured was objectively unexpected and unintended by the insured and happened out of the usual course of events . . .. ” *Bornstein* at 819. Similarly, in the instant case, Plaintiff argues the “minimal” burden of establishing coverage is satisfied simply by a showing the insured’s death was an unforeseeable event. (Doc. No. 21-1 at 13.)

---

[6] (Doc. No. 21-1 at 12.)

However, Plaintiff's argument that establishing Mr. Williams' death was "unexpected" is sufficient to trigger coverage under an "accidental death" policy has been rejected by the Ninth Circuit. *See Khatchatrian v. Cont'l Cas. Co.*, 198 F. Supp. 2d 1157, 1163-64 (C.D. Cal. 2002) *aff'd*, 332 F.3d 1227 (9th Cir. 2003). In *Khatchartrian*, the court found "[t]he *Bornstein* test is both too broad and too imprecise; nearly all deaths are unintended by the insured, whether they are 'expected' is impractical to ascertain and so is whether they happen outside of the usual course of events." *Khatchatrian v. Cont'l Cas. Co.*, 198 F. Supp. 2d 1157, 1163-64 (C.D. Cal. 2002) *aff'd*, 332 F.3d 1227 (9th Cir. 2003). This reasoning is highly persuasive as it is undeniable that Mr. Williams' sudden death was "unexpected" under the circumstances.

Thus, regardless of whether the Policy is an "accidental death" or "accidental means" policy, Plaintiff must establish that Mr. Williams' death was the result of an accident. California courts have been unwilling to find that an injury or death was "accidental" unless "it was in some manner caused by an event or occurrence unforeseen and external to the insured."[7] As the court in *Khatchatrian* noted, "if the cause of death was a process or occurrence that took place solely within the decedent's body, it cannot be 'external' and thus cannot be 'accidental.' " *Khatchatrian*, 198 F. Supp. 2d at 1163-64. As such, Plaintiff must nevertheless establish Mr. Williams' death was the result of an accident "external to the body." To permit Plaintiff to recover by demonstrating only that Mr. Williams' death was unexpected would be inconsistent with *Khatchatrian* as well as the Policy language. Therefore, Plaintiff must demonstrate coverage existed under the unambiguous terms of the Policy.

---

[7] *See e.g. Williams v. Hartford Accident and Indem. Co.*, 158 Cal. App. 3d 229 (1984) (affirming summary judgment for the insurance company where the plaintiff suffered an unforeseen retinal tear that was aggravated by jogging because the activity of jogging did not cause the tear and could not be characterized as an "accident"); *Alessandro v. Massachusetts Cas. Ins. Co.*, 232 Cal. App. 2d 203, 207 (1965) (finding the insured's death was not an accident because there was "no evidence of . . . any external force striking the body of the appellant"); *Zuckerman v. Underwriters at Lloyd's, London*, 42 Cal. 2d 460 (1954) (insured's death from bronchopneumonia did not amount to evidence "of an unforeseen, external event").

**D. Whether DVT and PE Constitute An Accident External To The Body**

Here, the cross-motions for summary judgment hinge on the meaning of an "injury" as applied to Mr. Williams' death, which both parties agree resulted from PE caused by DVT. As noted previously, the term "injury" is defined by "Endorsement E-5" which provides a specific, three-part definition encompassing an injury:

> (1) which is sustained as a direct result of an unintended, unanticipated accident that is external to the body and that occurs while the injured person's coverage under this Policy is in force; (2) which occurs under the circumstances described in a Hazard applicable to that person; and (3) which directly (independent of sickness, disease, mental capacity, bodily infirmity or any other cause) causes a covered loss under a Benefit applicable to such Hazard.

(AR D 00173.) The threshold determination, therefore, is whether Mr. Williams sustained a bodily injury as a "direct result of an unintended, unanticipated accident that is external to the body."

The parties do not dispute that coverage was in effect on the date of Mr. Williams' death; nor do the parties dispute that Mr. Williams was, in the days preceding his death, a passenger in or on a civilian aircraft as it relates to the terms of the Policy under which Plaintiff claims she is entitled to benefits.[8] As such, the Court need not address these prerequisites to coverage. Additionally, since the final prong of the definition relates to exclusions, this portion of the definition need only be addressed upon an initial finding of coverage. Thus, the Court must first determine whether death by DVT/PE is the result of an unintended, unanticipated accident that is external to the body under the terms of the Policy.

Though the term "accident" is not explicitly defined in the Policy, the Supreme Court has consistently recognized a definition of "accident" consistent with the express terms of the Policy at issue. As the basis of the parties' dispute is a matter of contract interpretation, the Court must ascertain the ordinary and common meaning of the term "accident." *See Allstate Insurance Co. v. Ellison*, 757 F.2d 1042, 1044 (9th Cir. 1985) (

---

[8] The Policy provided coverage for loss that occurred between February 15, 2010 to February 15, 2011, and for "injury sustained . . . while riding as a passenger in or on . . . any Civilian Aircraft . . .". (A.R. 00016, 00037.)

"ERISA insurance policies [are interpreted] in an ordinary and popular sense as would a [person] of average intelligence and experience.") (internal citation marks omitted). In doing so, the Court finds it instructive to consider cases that have considered this issue under similar circumstances. As set forth more fully below, the Court finds such cases persuasive in determining what constitutes an "accident external to the body," and whether DVT and PE are encompassed within that definition.

***1. Cases Defining "Accident"***

The United States Supreme Court has extensively evaluated the term "accident" within the meaning of the Warsaw Convention.[9] *See Air France v. Saks*, 470 U.S. 392, 405 (1985); *Olympic Airways v. Husain* 540 U.S. 644, 652-54 (2004). Though the present matter does not raise issues of airline liability under the international treaty, the Supreme Court's analysis in the Warsaw cases addresses issues similar to those raised in the instant matter within the context of the ordinary and common meaning of "accident."

For example, in *Air France v. Saks*, the Supreme Court addressed whether a passenger's "loss of hearing proximately caused by normal operation of the aircraft's pressurization system" was an "accident." *Saks*, 470 U.S. at 395. In finding the passenger's injuries were not an "accident," the Court noted that something more than "the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft" would be necessary to constitute an accident. *Id.* at 405, 406. The Court went on to define an "accident" as "a passenger's injury [that] is caused by an unexpected or unusual event or happening that is external to the passenger." *Id.* at 405. This definition is instructive as the prerequisite for recovery under the Warsaw Convention is set forth in

[9] The "Warsaw Convention," is formally referred to as "The Convention for the Unification of Certain Rules Relating to International Transportation by Air." Article 17 of the Warsaw Convention "establishes the liability of international air carriers for harm to passengers." *Saks*, 470 U.S. at 397. Specifically, Article 17 provides: "The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking." *Id.* at 397–98. The text of the Warsaw Convention does not define the term "accident." For the purposes of this order, the Court will reference case law interpreting and applying the terms of the Convention as the "Warsaw cases."

terms nearly identical to the coverage provisions of to the Policy at issue: an accident or happening that is "external to the body." Similarly, in *Olympic Airways v. Husain*, the Supreme Court again noted that an "accident inquiry" requires a plaintiff to prove "some link in the chain was an unusual or unexpected event external to the passenger." *Olympic Airways v. Husain*, 540 U.S. 644, 652 (2004) (quoting *Saks*, 470 U.S. at 399) (internal citations omitted).

Further, the Ninth Circuit has specifically addressed whether a passenger's development of DVT constitutes an "unexpected or unusual event or happening that is external to the passenger," thereby triggering liability under the Warsaw Convention. *See e.g. Rodriguez v. Ansett Austl. Ltd.*, 383 F.3d 914, 919 (9th Cir. 2004); *Caman v. Cont'l Airlines, Inc.*, 455 F.3d 1087, 1089 (9th Cir. 2006); *Blotteaux v. Quantas Airways, Ltd.*, 171 Fed. Appx. 566 (9th Cir. 2006). In circumstances similar to those in the instant case, the *Blotteaux* court noted, "No evidence ha[d] been presented that anything unusual occurred aboard the Quantas flight in question, or that [the plaintiff's] development of DVT was triggered by anything other than his own internal reaction to the prolonged sitting/inactivity attendant to any lengthy flight." *Blotteaux*, 171 Fed. Appx. at 568-69. Additionally, in *Rodriguez v. Ansett Austl. Ltd.*, the court noted, "the only event was [plaintiff's] development of the DVT. Consequently, there was no event external to the passenger, let alone an unusual or unexpected event." *Rodriguez*, 383 F.3d at 918. Based on these conclusions, the Ninth Circuit found development of DVT was not an "accident" as required to trigger liability under the Warsaw Act.

Plaintiff attempts to distinguish the Warsaw line of cases by noting that liability under the Warsaw Convention is derived from tort law, while the issue at hand arises in the context of insurance liability. (Doc. No. 27 at 2.) Plaintiff also argues that Defendant's policy language defining a covered loss is distinct from the Warsaw cases defining "accident." (Doc. No. 27 at 2.) As support for these propositions, Plaintiff distinguishes the purpose and history of the Warsaw Convention from the Policy at issue. (Doc. No. 27 at 4.) While the purpose of the Warsaw Convention may not be comparable to the

underlying insurance policy, both the Warsaw Convention and Defendant's Policy award damages to those who suffer from an accident or unexpected happening external to the body. The accepted definition of an "accident" under the Warsaw Convention and as defined in the Policy are nearly identical. Moreover, other courts' interpretations of the ordinary and common meaning of "accident" are relevant as to the ordinary and common meaning of the term, regardless of the context. As such, the Court finds the analysis in the above-mentioned cases highly persuasive to the interpretation of whether Mr. Williams' death from DVT and PE constitutes an "accident" within the terms of the Policy.

***2. ERISA Cases***

As additional support for the proposition that the interpretation of an accident set forth in the Warsaw cases is applicable in the ERISA context, Defendant cites an unpublished case from the Eastern District of Missouri. *McAuley v. Federal Ins. Co.*, 2009 WL 913510. While certainly not controlling, the court in *McAuley v. Federal Ins. Co.* addressed the precise issue currently before the Court, specifically whether an airplane passenger's development of DVT constitutes an "injury" in the context of an ERISA benefit policy. *See McAuley v. Federal Ins. Co.*, 2009 WL 913510. In making its determination, *McAuley* relied on the Supreme Court's definition of "accident" as set forth in the *Air France v. Saks*, and the Ninth Circuit precedent discussed above, to conclude that the development of DVT was not covered under the terms of the accidental death insurance policy. *Id.* at *17. The court emphasized the insured had not presented evidence of any "unusual or unexpected event external to the decedent," and therefore was not entitled to recover under the Policy because the insured's development of DVT thus failed to qualify as an accident. *Id.* Notably, *McAuley* found the Supreme Court's reasoning in defining "accident" pursuant to the Warsaw Convention "to be lucid and reasonable on the question of what constitutes an 'accident'" under an ERISA policy.

*Id.*[10]

Under the circumstances, the Court agrees with the court's conclusion in *McAuley*. Given the similarities among the definition of an "accident" as set forth by the Supreme Court, adopted by the Ninth Circuit, and applied in the limited context of an ERISA policy in *McAuley*, the Court will apply such principles to the Policy at issue.

***3. Mr. Williams' Policy***

In the instant case, neither party disputes Mr. Williams' air travel in the days immediately proceeding his death lacked any unusual or unexpected events. Though, as Plaintiff contends, development of DVT/PE "is unintended and unanticipated," this fact alone is insufficient to overcome the express language of the Policy requiring an accident *external* to the body in order to invoke coverage. Plaintiff's contention that Mr. Williams' cause of death was external "because his death was caused by confined sitting for a prolonged period in an airline seat" is unavailing in light of authority to the contrary. Specifically, courts have consistently held that development of DVT is a passenger's "own internal reaction to the usual, normal, and expected operation of the aircraft." *Rodriguez,*, 383 F.3d at 917 (citing *Saks*, 470 U.S. at 406 (internal citations omitted); *see also Blotteaux*, 171 Fed. Appx. at 568-69; *McAuley*, 2009 WL 913510.

Plaintiff argues Mr. Williams' death caused by confined seating during his extensive travel itinerary is similar to the facts presented in *Paulissen v. U.S. Life Ins. Co. in City of New York*, which involved the death of a mountain climber from high altitude pulmonary edema ("HAPE"). *Paulissen*, 205 F. Supp. 2d at 1128-29. Finding coverage,

---

[10] McAuley's approach and adoption of the *Saks* definition of an accident as applied to an ERISA insurance policy was also followed in *Appeldorn v. Hartford Life & Acc. Ins. Co.*, 1:09-CV-069, 2010 WL 3475915, *5 (D.N.D. Sept. 2, 2010). *Appeldorn* dealt with a passenger's development of meningitis on an airline flight, in which the court concluded "developing the disease of meningitis on an ordinary and uneventful airplane flight does not qualify as an 'injury' or an 'accident' under Policy." *Id.* The policy at issue in *Appeldorn* defined "injury" in pertinent part as, "bodily injury resulting directly and independently of all other causes." *Id.* at *4. Citing the lack of ERISA case law directly on point, the court adopted the reasoning set forth in *McAuley* despite the absence of express policy language requiring an event or happening "external to the body." *Id.* at *5.

the court concluded "death from HAPE cannot be said to be a common or expected result of a trek at high altitudes. Mr. Paulissen's 'death was caused by accident because it was an unusual or unanticipated result flowing from a commonplace cause.' " *Id. (quoting Carroll v. CUNA Mutual Ins.,* 894 P.2d 746, 749 (Colo. 1995). Notably, however, the insurance policy at issue in *Paulissen* did not define the terms "accident" or "injury," and did not include the relevant language requiring an accident external to the body as did Mr. Williams' Policy. As such, *Paulissen* is distinguishable from the instant matter. *Id.* at 1124. Here, the express language of the Policy defines injury as something that is "external to the body," and the interpretation of such language has consistently been held to exclude development of DVT.

Plaintiff further argues Mr. Williams' confined seating was the "external" cause of his DVT development and ,thus, the definition of injury has been met given the circumstances surrounding Mr. Williams' death. (Doc. No. 21-1 at 15.) Similarly in *Rodriguez*, a Ninth Circuit case addressing whether DVT was an "accident" thereby triggering liability under the Warsaw Convention, the plaintiff argued her DVT was caused by cramped seating conditions. *Rodriguez*, 383 F.3d at 918. The court rejected this contention, however, finding that development of DVT was the Plaintiff's "internal reaction" to the operation of the aircraft, and thus did not constitute an "accident." *Id.* In light of this reasoning, Plaintiff's argument is not persuasive.

Here, the evidence suggests Mr. Williams' death from DVT/PE resulted from his own internal reaction to the operation of the aircraft. Although Mr. Williams was in fact "confined" for a significant period of time during his lengthy periods of air travel, courts have routinely rejected Plaintiff's contention that development of DVT is a result of anything external to the body. Finally, the Court finds the Warsaw cases and the reasoning included therein regarding whether DVT is "external" to the body persuasive with respect to the issue of contract interpretation raised in the instant matter. In light of these cases along with the Court's own understanding, the ordinary and common meaning of "accident" does not encompass DVT/PE under these circumstances as both parties

acknowledge there was no unusual or unexpected event external to Mr. Williams that occurred beyond the prolonged sitting generally associated with air travel. Additionally, though not binding, the Court finds no reason to vary from the decisions of other courts in concluding the Warsaw definition of "accident" is applicable in the ERISA context. As such, the Court finds no reason to reach a different conclusion for passengers who suffer from DVT/PE in ERISA cases. The Supreme Court and Ninth Circuit precedent cited herein are highly indicative of the "ordinary and popular" interpretation of an "accident" within the Policy. While Plaintiff advances arguments in support of finding DVT is caused by an external event, such a conclusion is unsupported by precedent. The Court is thus unwilling to adopt Plaintiff's view that Mr. Williams' death by DVT was an "accident" external to the body due to confined seating conditions, as such a conclusion would amount to an impermissibly strained interpretation of the Policy language.

In sum, Plaintiff has failed to demonstrate that Mr. Williams' death was the result of an accident external to the body, and therefore Mr. Williams' death is not covered under the accidental death policy issued by Defendant. Thus, Plaintiff has failed to meet the requisite burden of establishing coverage, and is thus not entitled to benefits under the Policy.[11]

//

//

//

//

//

//

---

[11] Plaintiff raises additional arguments regarding the inapplicability of Policy exclusions in support of her motion for summary judgment. (Doc. Nos. 21-1 at 18.) However, whether or not Mr. Williams' death falls within an exclusion to coverage is only relevant if coverage has initially been established under the terms of the Policy. Because the Court finds Mr. Williams' death was not covered under the terms of the Policy, the applicability of exclusions to the Policy becomes a moot issue.

**CONCLUSION**

For the reasons set forth above, the Court DENIES Plaintiff's cross-motion for summary judgment, (Doc. No. 21), GRANTS Defendant's cross-motion for summary judgment, (Doc. No. 22), and directs judgment be entered in favor of Defendant.

IT IS SO ORDERED.

DATED: April 9, 2013

Hon. Anthony J. Battaglia
U.S. District Judge